UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| System Parking, Inc., an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| Andrew Carlson, an Illinois resident; LAZ | ) | PLAINTIFF DEMANDS |
| Parking Chicago, LLC, a Connecticut limited | ) | TRIAL BY JURY |
| liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, System Parking, Inc., by its attorneys, Timothy S. Buckley, Timothy J. Riordan,

Leonard W. Sachs, and Stephanie A.S. Stinton, for its Complaint for Injunctive and Other Relief

against Defendants, Andrew Carlson and LAZ Parking Chicago, LLC, states as follows:

## NATURE OF THE ACTION

This case involves a faithless former executive who, as an accountant and senior

manager, held a position of the utmost trust and confidence. He betrayed his employer in willful

violation of his common law duties of fidelity and loyalty and in derogation of his statutory

obligations not to misappropriate confidential proprietary business data, nor to damage his

employer's information technology.

System Parking, Inc., ("System") gave Andrew Carlson ("Carlson") his first job

opportunity immediately after graduating from college, employing him as a staff accountant.

System supported and promoted Carlson throughout his five-year career until he ascended to the

position of Director of Marketing and Client Relations. As Director of Marketing and Client

Relations, and an accountant with management responsibility for all financial and accounting

functions, Carlson owed duties of fidelity and loyalty to System. After Carlson tendered his notice of resignation, System flew him to California to meet with the CEO, David Damus ("Damus"), and General Counsel, John Day ("Day"), of System's parent company, The L&R Group of Companies, Inc. ("L&R"), who requested that Carlson stay with System and offered him an enhanced compensation package. Notwithstanding the trust and confidence granted him by System and the efforts senior management made to ensure his continual loyalty, Carlson systematically mass deleted e-mails from System's Microsoft Exchange E-mail Server; converted System's confidential and proprietary business information, including the most confidential financial information over which Carlson maintained responsibility; and left System's employment to work for LAZ Parking Chicago, LLC ("LAZ"), a direct competitor of System. At the time Carlson engaged in this wrongful conduct, he already had decided to leave System's employment and work for LAZ. Despite System's request, Carlson failed, and continues to refuse, to return the files in his possession to their rightful owner. Carlson's actions threaten System with irreparable harm. Accordingly, System seeks injunctive relief to prevent further injury to System and to recover damages it has suffered as a result of Carlson's willful, faithless, and unlawful conduct.

## PARTIES

1.     Plaintiff, System, is an Illinois corporation with its principal place of business located in Chicago, Illinois.

2.     Defendant, Carlson, is an Illinois resident who resides in Chicago, Illinois.

3.     Defendant, LAZ, is a Connecticut limited liability company, registered to do business in Illinois, with offices in Chicago, Illinois.

2

## JURISDICTION AND VENUE

4.     This Court properly exercises jurisdiction over this matter pursuant to 28 U.S.C. §1331 (2010), because the acts of Carlson violate federal law, specifically, the Computer Fraud and Abuse Act, 18 U.S.C. §1030 (West 2010), for which System possesses a civil cause of action under 18 U.S.C. §1030(g) (West 2010), and the remaining claims are so related that they form part of the same case or controversy and the Court should exercise supplemental jurisdiction over them pursuant to 28 U.S.C. §1367 (2010).

5.     Venue properly lies in this district because System brings this matter in the judicial district in which a defendant resides and in which a substantial part of the events giving rise to the alleged claims occurred.  28 U.S.C. §§ 1391(b)(1)-(2) (2010)

## GENERAL ALLEGATIONS

6.     In May, 2004, while a college student at Maranatha Baptist Bible College, Carlson began his employment as an accounting intern in System's accounting department.

7.     Upon his graduation in May, 2005, System hired Carlson as a full-time staff accountant.

8.     As a staff accountant, Carlson enjoyed free access to confidential financial information including, but not limited to, balance sheets, profit and loss statements, budgets, and client account information.

9.     Carlson subsequently assumed responsibilities in the marketing and client relations functions of System's business.

10.     System gradually increased Carlson's marketing and client management responsibilities until his job duties heavily involved the marketing, sales, and client relations aspect of System's business.

11.    Nevertheless, throughout his employment with System, Carlson retained his staff accountant duties and responsibilities.

12.    At the time of his resignation from employment with System, Carlson attained the title of Director of Marketing and Client Relations in the marketing department, a position he held since April, 2008.

13.    As a Director of Marketing and Client Relations in the marketing department, Carlson's responsibilities included:

      (a)    Accounting – preparing and/or overseeing the preparation by other staff accountants of many of the management reports for each of System's 86 customers, which consist of:

            (i)    Profit and loss statement
            (ii)    Revenue summaries and ledgers
            (iii)    Daily transient revenue
            (iv)    Monthly parker revenue
            (v)    Advertising revenue
            (vi)    Monthly rent roll
            (vii)    Expense reports, which include line items for expenses such as insurance charges, service invoices, and System's management fee
            (viii)    A cover letter to the client summarizing the contents of the management report

      (b)    Research – performing the research or overseeing field personnel in performing the research, including:

            (i)    Evaluating the property, size of the garage, age of the garage, and number of cars parked in the garage
            (ii)    Evaluating the potential revenue
            (iii)    Evaluating a profitable guaranteed rent, if the contract was to pay rent with System receiving all of the profits generated from the garage, or evaluating a profitable budget, if the contract was for a management fee

      (c)    Preparing proposals

            (i)    Prepare the first draft of numbers in an excel spreadsheet
            (ii)    Meet with other System executives to determine the bid amount
            (iii)    Prepare the operational plan

          (iv)    Prepare power point presentations

          (v)     Deliver the presentation

    (d)    Maintain the client relationship

          (i)     Inter-office point person for client

          (ii)    Respond to client issues

          (iii)   Engage in regular client communication

14.     In or around May 2008, System was acquired by L&R. In or around August 2008, System adopted and implemented L&R's written Information Security Policy, a copy of which is attached as Exhibit A to the Memorandum in Support of Temporary Restraining Order and Preliminary Injunction.

15.     On or about August 26, 2008, Carlson executed an Acknowledgment of Information Security Policy ("Security Acknowledgment"), which states, in relevant part:

By signing below, I agree to the following terms:

i.     I have received and read a copy of the "Information Security Policy" and understand the same;

ii.    I understand and agree that any computers, software, and storage media provided to me by the company contains proprietary and confidential information about *System Parking* and its customers or its vendors, and that this is and remains the property of the company at all times;

iii.   I agree that I shall not copy, duplicate (except for backup purposes as part of my job here at *System Parking*, otherwise disclose, or allow anyone else to copy or duplicate any of this information or software;

iv.   I agree that, if I leave *System Parking* for any reason, I shall immediately return to the company the original and copies of any and all software, computer materials, or computer equipment that I may have received from the company that is either in my possession or otherwise directly or indirectly under my control. See Memorandum Exhibit A.

16.     As an accountant and Director of Marketing and Client Relations, Carlson enjoyed access to confidential and proprietary financial, client, and marketing information

otherwise unavailable to all but the highest ranking of System's 700-800 employees and of L&R's 5,500 employees.

17.     Each employee receives a username and password. Access to certain shared files or individual files is granted or restricted by username. Employee passwords must be changed every ninety days.

18.     System and L&R granted access to confidential and proprietary financial, client, and marketing information to certain employees on a strict need-to-know basis. Carlson's username, "acarlson", granted him access to the Accounting, Auditing, Great Plains, Marketing, and Operations shared files. In addition to senior management personnel, only employees in the marketing and accounting departments were allowed access to these documents. Not even field managers, which include approximately 30-40 of System's employees, receive access to these materials.

19.     The number of L&R employees in the marketing and accounting departments with access to confidential financial, client, and marketing information totals approximately thirty. Occasionally, other employees are granted temporary access to certain files to play a role in a particular project or bid proposal. Upon completion of that task, however, access is withdrawn.

20.     L&R requires that all vendors it engages enter into a confidentiality agreement.

21.     On December 4, 2009, after four interviews with LAZ, Carlson tendered his resignation from System. See Andrew Carlson MBBC Business Alumni entry attached as **Complaint Exhibit 1**.

22.     Between December 8, 2009, and December 10, 2009, Carlson traveled to California to meet with Damus and Day. During this time, Damus and Day attempted to

convince Carlson to stay with System, however, Carlson informed them that he would be leaving System's employment.

23.     On December 16, 2009, Carlson left the employment of System.

24.     Upon termination of Carlson's employment on December 16, 2009, System requested the return of all System property.  Carlson returned a System-owned laptop that he was permitted to use during his employment with System.

25.     On December 21, 2009, Carlson began working for LAZ as Director of Business Development in Chicago.  See **Complaint Exhibit 1**.  System and LAZ are direct competitors and vigorously compete for the same customers and contracts in the competitive Chicago market.

26.     As an employee of LAZ, Carlson contacted at least two of System's customers in an attempt to acquire customers from System.  See Declaration of Todd Tucker[1].  In his attempts to steal customers from System, Carlson made material misrepresentations regarding System's pricing.  See e-mail correspondence appended to Declaration of Todd Tucker.

27.     System learned of these communications and became concerned about Carlson's actions and the information he might be using against System in the marketplace.  System hired Forensicon, Inc. ("Forensicon"), a computer forensics company, to examine the desktop computer assigned to and utilized by Carlson during his employment with System ("System's Computer").  See Declaration of Scott R. Jones.

28.     Prior to his last day of employment with System, and in particular, November 23, 2009, through December 16, 2009, Carlson copied, downloaded, or transferred certain proprietary and confidential information from System's Computer onto portable external drives. See Declaration of Scott R. Jones.

---

[1] All declarations referenced in this Complaint for Injunctive and Other Relief are the declarations attached to System Parking, Inc.'s Memorandum in Support of its Motion for Temporary Restraining Order and Preliminary Injunction.

29.     For example, on December 2, 2009, two days prior to the date Carlson tendered his resignation from System, Carlson copied the file "PL oct2009.xls" to his personal portable external storage device. See Declaration of Scott R. Jones.

30.     Prior to his last day of employment with System, and in particular, November 23, 2009, through December 16, 2009, Carlson deleted certain proprietary and confidential information from System's Computer. Declaration of Scott R. Jones.

31.     Prior to his last day of employment, Carlson permanently deleted the e-mails from the Microsoft Exchange E-mail Server for the time period from September 17, 2009, through December 2, 2009, and from December 7, 2009, through December 16, 2009. See Declaration of Yaniv Schiff.

32.     At all relevant times, System owned both the laptop used by Carlson and System's Computer and the subject proprietary, confidential, and trade secret information.

33.     Carlson's actions were contrary to and unauthorized by System's stated Security Acknowledgment; in excess of the access granted to Carlson in that they were not in furtherance of his duties; and in breach of the duties of fidelity and loyalty he owed to System.

34.     The files that Carlson copied, downloaded, transferred, or deleted contain confidential and trade secret information concerning System's profit and loss statements for the entire company, financial information for individual customers, pro forma financial information for 2010, historical customer data, and marketing information. The files are identified in the Declaration of Scott R. Jones. The documents, spreadsheets, files, and information identified in the Declaration of Scott R. Jones, the deleted e-mails identified in the Declaration of Yaniv Schiff, and other information identified in this Complaint for Injunctive and Other Relief as confidential or proprietary information shall be referred to as the "Information".

35.    As a result of Carlson's actions in copying, downloading, transferring, or deleting the Information from System's Computer, System has been required to expend substantial funds in an attempt to identify the affected documents and to restore the deleted information through the services of Forensicon.

36.    On March 3, 2010, System sent a letter to Carlson and LAZ demanding that Carlson and LAZ cease the use and possession of System's Information and preserve evidence. A copy of the March 3, 2010, letter is attached as **Complaint Exhibit 2**.

37.    On March 22, 2010, System sent a second letter requesting production and preservation of eight devices with portable storage capacity that were shown to have been plugged into System's Computer in the months prior to Carlson's last day of work. A copy of the March 22, 2010, letter is attached as **Complaint Exhibit 3**.

38.    Of those eight devices, the SanDisk U3 Cruzer Micro Device is alleged by Carlson to have been turned over to System on his last day of work and the Imation Nano USB Device is alleged to have been produced to counsel for Defendants and turned over to Pro Tech, a computer forensic company, for preservation and imaging. The remaining six devices are unaccounted for by Carlson.

## INJUNCTIVE RELIEF

39.    System possesses a clearly ascertainable right to protect its confidential Information from disclosure to competitors or customers and from use by competitors, including LAZ and its employee, Carlson.

40.    In addition to the compensable injuries that System has suffered and will continue to suffer as a result of Carlson's conduct, System faces irreparable harm from the disclosure or use of its confidential Information by Carlson or LAZ. Once the Information has been disclosed

by Carlson to LAZ or a customer, or otherwise used by Carlson to gain competitive advantage over System, no effort could reverse the damage done.

41.     System has no adequate remedy at law for the injury sustained as a result of Carlson's conduct.

42.     System enjoys a substantial likelihood of success on the merits.

## COUNT I
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030
### (Carlson)

43.     System realleges and incorporates by this reference Paragraphs 1-41.

44.     System's Computer is a "protected computer" as the term is defined in the Computer Fraud and Abuse Act ("CFAA"), because it is used in and affects interstate commerce and communications.  18 U.S.C. § 1030(e)(2) (West 2010).   Specifically, it is used in the business of L&R, a California corporation of which System is a wholly-owned subsidiary, and which conducts business in twenty states throughout the United States of America.

45.     As described above, in the weeks prior to Carlson's last day of employment with System, Carlson intentionally accessed System's Computer and copied, transferred, downloaded, and/or deleted the Information for purposes outside the scope of his employment with System.

46.     Carlson's actions were not in the course of his duties as an employee of System and, further, were in derogation of the written policy concerning information security, the receipt and review of which Carlson acknowledged and with which he agreed to abide. See Declaration of Lorenzo Young.

47.     Carlson's actions exceeded the scope of his authorization as an agent of System, and Carlson therefore exceeded his authorized access to System's Computer and System's server when he copied, transferred, downloaded, and/or deleted the Information.

48.     Carlson accessed the Information, which belongs to System, from System's Computer in a manner that exceeded his authorization to access that computer. As illustrated below, these actions recklessly caused both damage and loss and are in violation of Sections (a)(2)(C), (a)(5)(B), and (a)(5)(C) of the CFAA. 18 U.S.C. §§ 1030(a)(2)(C), (a)(5)(B)-(C) (West 2010).

49.     Carlson's actions caused damage to System's Computer by impairing the availability of data and information contained in the following files, which cannot be opened or can be opened but with corrupted data:

     a.    1720-Oct-EOM[1].pdf
     b.    1720-%20Sept-EOM[1].pdf
     c.    FRENCH MARKET.xls
     d.    PL 2008-OCT 2009.xls
     e.    Systems Parking CHI DEC 09 Rent Statement.xls

50.     Carlson's actions in deleting e-mails from September 17, 2009, through December 2, 2009, and from December 7, 2009, through December 16, 2009, caused further damage by impairing the availability of those e-mails and the information contained in them.

51.     System has expended sums in excess of $5,000.00 to respond to the offense and employ Forensicon to conduct a damage assessment of System's Computer. Additional sums will need to be expended to restore data and information to its condition prior to Carlson's conduct.

**WHEREFORE**, System Parking, Inc., requests the Court, pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) (West 2010), to enter an order granting to it temporary and preliminary injunctive relief and damages against Andrew Carlson as follows:

     a.    Prohibit Andrew Carlson from utilizing or distributing the Information to others;

     b.    Prohibit Andrew Carlson from contacting any current or

prospective customer of System; and

c. Award System Parking, Inc., damages in the amount of its actual loss caused by Andrew Carlson's unauthorized access, to be proven at trial.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
### (Carlson and LAZ)

52. System realleges and incorporates by this reference Paragraphs 1-50.

53. The Information, including System's 13-month profit and loss statement, pricing information for The University of Chicago Medical Center, and Starwood proposal documents contain formulas, data compilations, financial data, and customer information that constitute trade secrets under the Illinois Trade Secret Act (the "ITSA"), 765 ILL. COMP. STAT 1065/1-9 (2010).

54. Specifically, the profit and loss statement, entitled "PL 2008-OCT 2009.xls" on the hard drive of System's Computer and "PL oct2009.xls" on Carlson's personal portable storage device, contains the overall profit and loss statement for System, which breaks down System's financial information for the past 13 months into revenue, operating expenses, and net income. See Declaration of Todd Tucker. See Declaration of Scott R. Jones. Operating expenses are itemized into 33 line items, illustrating how much money System expends on a monthly and yearly basis and where that money is spent. The same breakdown is prepared for each of the 86 parking facilities managed by System.

55. The Information is not generally known to other entities in the parking facility management industry.

56. Competing businesses in the parking facility management industry would derive significant economic value from knowing System's financial data, as competitors could duplicate

System's business practices by implementing similar cost and revenue models and identify System's customers and their revenue potential. Competitors could identify the most profitable of System's customers and solicit their business, while identifying the least profitable of System's customers and using that information to determine whether to forego that customer's business. Competitors also could gain a competitive advantage by knowing and analyzing System's financial data when generating proposals and bids for future management contracts. Knowledge of System's bidding practices and financial data would allow a competitor to under-bid System and obtain management contracts using the Information it did not rightly obtain.

57. Competing businesses in the parking facility management industry would derive significant economic value from knowing and using System's formulas and data compilations, as this information has been generated over years of management experience and these formulas have been developed over time to assist System in the accurate analysis of the potential profitability of a management contract. Furthermore, it would be difficult for a competitor to duplicate or quickly acquire this information. This information is broken down to evaluate how many parkers utilize an individual parking facility by day, month, and year; how long each parker spent in the parking facility; how many monthly parkers utilize the facility and when they park in the facility; how much revenue is generated by day, month, and year; and how that revenue compares to prior years. It would be impossible for a competitor to go back in time and reproduce past data and also would be nearly impossible for a competitor to currently compile this information because of the time and money it would require.

58. Carlson acquired the Information while employed by System, which gave rise to a duty to maintain its secrecy and limit the use of the Information to benefit only System. Despite that duty, Carlson used the Information, without the express or implied consent of System, and

while he had reason to know the Information constitutes trade secrets, in violation of Section (2)(b)(2)(B)(II) of the ITSA. 765 ILL. COMP. STAT 1065/2(b)(2)(B)(II) (2010).

59.     Carlson knowingly copied, transferred, or otherwise transmitted the Information in derogation of the Information Security Policy and without authorization to do so and therefore acquired the Information by improper means, in violation of Section (2)(b)(2)(A) of the Act. 765 ILL. COMP. STAT 1065/2(b)(2)(A) (2010).

60.     Carlson has used System's confidential and proprietary Information to attempt to solicit at least one of System's current clients.

61.     Specifically, Carlson and other LAZ representatives have contacted the following seven System customers: Parkway Properties, Inc., Clybourne Galleria, Piper's Alley, Seneca Hotel, Washington-Franklin, Monroe-Wells, and Intercontinental O'Hare. See Declaration of Todd Tucker.

62.     System currently manages the parking facilities located in the building located at 111 East Wacker Drive, Chicago, Illinois ("Parkway Building"). On February 26, 2010, Carlson, on behalf of himself and LAZ, e-mailed a contact for the Parkway Building and misrepresented System's pricing information in an attempt to solicit a parking management contract for tenants at the Parkway Building. See Declaration of Todd Tucker.

63.     System employs reasonable methods to maintain the secrecy and confidentiality of its trade secrets, including, but not limited to:

    a.  The implementation of the Information Security Policy;

    b.  The use of usernames and passwords, which must be changed every ninety days;

    c.  Limiting access to confidential and proprietary Information to employees on a need to know basis;

14

d. Providing only temporary and restricted access to certain confidential and proprietary files for non-accounting, marketing, or senior management employees; and

e. Requiring vendors to enter into confidentiality agreements before engaging them.

64. It is inevitable that Carlson will use the Information in his current job at LAZ. LAZ is a direct competitor of System and the companies frequently bid on and compete for the same projects. Upon information and belief, Carlson was hired by LAZ to perform the exact duties in the Chicago area that Carlson previously performed for System, as evidenced by the solicitation of Parkway, a customer relationship Carlson previously managed for System. System is not aware of any protectionary measures that LAZ has put in place to prevent Carlson from using or disclosing the Information. Carlson's solicitation of Parkway indicates that no such measures exist or that any purported measures proved inadequate.

65. The acts of Carlson in misappropriating System's trade secrets were willful and malicious. Carlson misappropriated confidential and proprietary Information, including System's profit and loss statement -- a 100-plus page financial roadmap providing all the information a competitor would need to systematically pilfer every one of System's customers. Carlson took these willful and malicious actions in his last few days when he knew that he would be terminating his employment with System and beginning employment with its direct competitor, LAZ. He subsequently contacted at least two of System's customers and attempted to use false information to acquire the Parway Building management contract from System. Furthermore, he took all of these actions with the knowledge of the severe and irreversible damage his conduct would inflict.

**WHEREFORE**, System Parking, Inc., requests the Court, pursuant to Sections 3 and 4 of the Illinois Trade Secrets Act, 765 ILL. COMP. STAT 1065/3-4 (2010), to enter an order

granting to it temporary and preliminary injunctive relief and damages against Andrew Carlson as follows:

    a.    Prohibit Andrew Carlson from utilizing or distributing System's trade secrets to others;

    b.    Prohibit LAZ Parking Chicago, LLC, from utilizing or distributing System's trade secrets to others;

    c.    Prohibit Andrew Carlson from contacting any current or prospective customer of System for a period deemed appropriate by the Court;

    d.    Prohibit LAZ Parking Chicago, LLC, and its employees and agents, from contacting any current or prospective customer of System for a period deemed appropriate by the Court;

    e.    Award System Parking, Inc., damages in the amount of its actual loss caused by Andrew Carlson's misappropriation of System's trade secrets to be proven at trial;

    f.    Award System Parking, Inc., damages for the unjust enrichment caused by Andrew Carlson's misappropriation of System's trade secrets to be proven at trial;

    g.    In the alternative, award System Parking, Inc., damages in the amount of a reasonable royalty rate for System's trade secrets;

    h.    Award System Parking, Inc., exemplary damages in the amount of twice any other award of damages as a result of the willful and malicious misappropriation of System's trade secrets by Andrew Carlson;

    i.    Award System Parking, Inc., its attorneys' fee and costs; and

    j.    Grant such further relief as the Court deems appropriate.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (Carlson)

66.    System realleges and incorporates by this reference Paragraphs 1-64.

67.    System entrusted Carlson with access to its confidential and proprietary business

Information in order for him to perform his job duties. System further entrusted Carlson with the use of that confidential and proprietary business Information throughout his employment with System.

68.     Carlson owed fiduciary duties of confidentiality, fidelity, and loyalty to System.

69.     Carlson breached those fiduciary duties when he accessed and used System's Information for his own use and benefit and for the use and benefit of an entity other than System.

70.     Carlson further breached those fiduciary duties by engaging in this unlawful action during working hours, for which System paid him salary and benefits.

71.     As a direct and proximate result of Carlson's breach, System has suffered and will continue to suffer injury and damage, in an amount to be proven at trial.

**WHEREFORE**, System Parking, Inc., requests the Court to enter judgment in its favor and against Andrew Carlson and award to it compensatory and punitive damages in an amount to be determined at trial.

## COUNT IV
## CONVERSION
### (Carlson)

72.     System realleges and incorporates by this reference Paragraphs 1-70.

73.     System maintains a right to the Information.

74.     System maintains an absolute and unconditional right to the immediate possession of the Information.

75.     System demanded the return of the Information and/or all confidential or proprietary System Information in Carlson's possession and the production of any and all storage devices containing such Information.

76. Carlson wrongfully, and without authorization, assumed control over the Information when he copied or otherwise transferred the Information from System's Computer.

**WHEREFORE**, System Parking, Inc., requests the Court to enter judgment in its favor and against Andrew Carlson and award to it compensatory and punitive damages in an amount to be determined at trial.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
### (LAZ)

77. System realleges and incorporates by this reference Paragraphs 1-75.

78. The Security Acknowledgment Carlson executed created binding, enforceable, contractual obligations in System's favor, including Carlson's agreements that he would not "copy, duplicate [or] otherwise disclose" the Information, that he would "immediately return to the company the original and copies of any and all software, computer materials, or computer equipment "and that System's [I]nformation at all times "is and remains the property of the company . . . ."

79. Carlson's continuing employment with System, after executing the Security Acknowledgment, constitutes adequate consideration to support the promises contained in it.

80. On information and belief, LAZ, at all relevant times, was aware of the Security Acknowledgment and the agreements and binding restrictions it contains, including Carlson's obligation not to disclose System's Information to any other party.

81. On information and belief, LAZ, with knowledge of the Security Acknowledgment and the agreements and restrictions it contains, wrongfully and without right or privilege to do so, induced Carlson to: (1) copy, duplicate, and disclose to LAZ and others System's Information; (2) fail and refuse to return System's Information; and (3) otherwise deny

System's continuing ownership of the Information, in violation of his contractual obligation not to do so.

82.     LAZ's wrongful inducement to Carlson to breach the Security Acknowledgment has caused System loss and damage in that it has been deprived of the full use and value of its confidential business Information, caused System to incur expense to attempt to cure that damage and recover the Information, and such loss and damage will continue for such times as Carlson and LAZ maintain the wrongful possession and use of the Information.

**WHEREFORE**, System Parking, Inc., requests the Court to enter judgment in its favor and against and LAZ Parking Chicago, LLC, and award to it compensatory and punitive damages in an amount to be determined at trial.

**PLAINTIFF DEMANDS TRIAL BY JURY FOR ALL COUNTS CONTAINED IN THIS COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF.**

Dated: April __, 2010.                     SYSTEM PARKING, INC.

                                            By:    /s/ Stephanie A.S. Stinton
                                                   One of Its Attorneys

Timothy J. Riordan, Esq. (ARDC #2343231)
Timothy S. Buckley, Esq. (ARDC #3128822)
Leonard W. Sachs, Esq. (ARDC # 06201822)
Stephanie A. Stinton, Esq. (ARDC #6293894)
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue, #1100
Chicago, Illinois 60604
(312) 372-4000
Attorneys for Plaintiff, System Parking, Inc.

Share   Report Abuse   Next Blog»                                    Create Blog   Sign In

# MBBC Business Alumni Blog

A blog kept by Department of Business faculty members to connect the business alumni of Maranatha Baptist Bible College. "For now we live, if ye stand fast in the Lord" (I Thessalonians 3.8).

**Saturday, January 2, 2010**

### Andrew Carlson ('05)

Andrew became engaged to Jeanna Cleland on Monday night 12/21/2009 and also started a new job the same day! We're very grateful for God's accomplishments in Andrew's life.

Andrew says: "Jeanna and I have dated since September 2007. She is a nursing graduate from Loyola University in Chicago. She has been working at a hospital in Waukegan, IL for six months and just got a new job at La Rabida Children's Hospital in Chicago starting January 4th. We are hoping to get married in the fall in Chicago.

"After four interviews with LAZ Parking in Chicago and spending



considerable time praying and reflecting on what the right decision was, I decided that I should take the new job with LAZ as their Director of Business Development in Chicago.

"Since these new life developments have not kept me busy enough, I have also gone back to school at the University of Chicago's Grahm School of General Studies to complete their Financial Decision Making Certificate. It is a six course MBA prep program and I begin my next two courses on January 5th. I will then take courses five and six in May and then decide when to start the MBA program."

Posted by Corey Pfaffe at 9:26 PM

Labels: 2005; Illinois

0 comments:

Corey Pfaffe, Dept Chair



Email me your update at cpfaffe@mbbc.edu

Ron Miller, Assoc. Professor



Email me your update at rmiller@mbbc.edu

Jeff Drost, Assistant Prof.



Email me your update at jdrost@mbbc.edu

Suzanne Fell, A

**EXHIBIT**

tabbies

1

# Howard & Howard

### law for business·

*Including the practice formerly carried on by Defrees & Fiske LLC*

| Ann Arbor | Chicago | Kalamazoo | Las Vegas | Peoria | Royal Oak |
|-----------|---------|-----------|-----------|--------|-----------|

Stephanie A. Stinton

Direct Dial: 312-456-3424
E-mail: sstinton@howardandhoward.com

March 3, 2010

065573.00008

**VIA HAND DELIVERY**
Antonio P. DiPaolo
Laz Parking Chicago
33 West Monroe Street
Chicago, Illinois 60603

Andrew Carlson
Laz Parking Chicago
33 West Monroe Street
Chicago, Illinois 60603

Re: **Demand to cease use and possession of System Parking, Inc.'s confidential information and to preserve evidence**

Dear Mr. DiPaolo and Mr. Carlson:

System Parking, Inc. ("System") has retained Howard & Howard Attorneys PLLC to investigate a potential action against Andrew Carlson. A forensic analysis of the computer previously used by Mr. Carlson during his employment at System has revealed evidence of unauthorized access, transfer and/or deletion of information and documents immediately prior to his termination of employment with System. We have also received information that Mr. Carlson has solicited current clients of System using information obtained during his employment with System.

In his position as a junior executive in the marketing department, and in his prior capacity as a Certified Public Accountant in the accounting department, Mr. Carlson accessed System's protected confidential financial statements and projections, budgets, bid templates, and client and prospective client information ("Confidential Information"). This information was acquired by Mr. Carlson in his capacity as an employee of System, intended to be used solely for the benefit of System, and protected as such. Mr. Carlson exceeded the scope of his authorization to access the Confidential Information when he did so with the intent to use it to the detriment of System in his employment with LAZ.

This correspondence shall serve as notice and demand that Mr. Carlson, individually and as representative of LAZ Parking Chicago ("LAZ"), cease any and all contact and communications with current and prospective clients of System and that Mr. Carlson and LAZ, preserve evidence and suspend any routine disruption, deletion, or purge functions on their

200 South Michigan Avenue, Suite 1100, Chicago, IL 60604-2401      tel 312.37

#1545596-v1

**EXHIBIT**

_2_

Antonio P. DiPaolo
Andrew Carlson
March 3, 2010
Page 2

respective computer systems to avoid spoliation of potential evidence. Specifically, we request preservation of the following:

1. Documents related in any way to Mr. Carlson becoming employed by or associated with LAZ;
2. Documents related in any way to communications between and among Mr. Carlson and LAZ;
3. Documents related in any way to System's Confidential Information;
4. Documents related in any way to any and all present or former customers, consultants, vendors, and business prospects and opportunities of System; and
5. Documents related in any way to Mr. Carlson's employment by or association with System.

It is intended that the word "document" includes retrievable data or other data compilations from which information could be obtained, including but not limited to, cell phones, computer storage tapes, CDs, floppy or other discs, hard drives, zip drives, thumb drives, laptop, mainframe and PC-type computers.

Failure to cooperate in this matter shall result in litigation to enforce System's rights to keep the Confidential Information protected from use by Mr. Carlson or any other unauthorized user or possessor of the Confidential Information. If Mr. Carlson continues to use or possess System's Confidential Information, a complaint will be filed seeking all possible remedies available under the law, including, but not limited to, injunctive relief and damages for violation of the Illinois Trade Secrets Act, violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030, breach of contract, conversion, tortuous interference with contract and breach of fiduciary duty.

It is System's intent and preference to resolve this matter quickly and without resorting to litigation. Please contact me to discuss this matter and work towards a resolution.

Very truly yours,

Stephanie A.S. Stinton

cc:     Todd Tucker (via e-mail)
        Mike McKee (via e-mail)

**ACKNOWLEDGED AND RECEIVED:**

_____          _____
Signature                         Date

Howard & Howard
law for business

# Howard & Howard
### law for business·

*Including the practice formerly carried on by Defrees & Fiske LLC*

| Ann Arbor | Chicago | Kalamazoo | Las Vegas | Peoria | Royal Oak |
|---|---|---|---|---|---|

Stephanie A. Stinton

Direct Dial: 312-456-3424
E-mail: sstinton@howardandhoward.com

March 22, 2010

065573.00008

**VIA E-MAIL (cdonham@shefskylaw.com)**
Mr. Cary E. Donham, Esq.
Shefsky & Froelich
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601

Re:     **System Parking and Laz Parking**

Dear Mr. Donham:

During our conversation on Friday, you indicated that Andrew Carlson turned over to you one thumb drive, which you have subsequently turned over to the computer forensic company, Pro Tech, for imaging and analysis. You also previously indicated that Andrew, upon termination of his employment at System, returned one thumb drive to System. Our computer forensic analysis of Andrew's desktop computer indicates the following portable external storage devices were used under the "acarlson" password-protected username immediately preceding his departure from System. We respectfully request that the following portable external storage devices, as identified by the "Friendly Name" disclosed by the analysis, be produced by Andrew and preserved and imaged by Pro Tech or our vendor, Forensicon:

1. RIM Blackberry
2. SanDisk U3 Cruzer Micro USB Device
3. Imation Nano USB Device
4. OLYMPUS C 160, D395 USB Device
5. USB Flash memory USB Device
6. Kingston Data Traveler 2.0 USB Device
7. Generic Storage Device USB Device
8. LEXAR Jumpdrive Secure USB Device

Please identify any of the foregoing devices that are alleged to be the device turned over by Andrew to System.

Thank you in advance for your cooperation in this matter.

Very truly yours,

Stephanie A.S. Stinton

cc:    Todd Tucker (via e-mail)
       Michael McKee, Esq.

**EXHIBIT 3**